A. B. SMITH and E. K. SMITH, Partners, Doing Business under Firm Name of A. B. SMITH LUMBER COMPANY, v. OHIO MILLERS MUTUAL FIRE INSURANCE COMPANY, Appellant.—26 S. W. (2d) 962.

Court en Banc, April 8, 1930.

52

*Samuel A. Harper, Howell & Howell, McGugin & Evans, Hay & Flanagan* and *N. C. Hawkins* for appellant.

54

*Ward & Reeves* for respondents.

WHITE, J.—Action on a fire insurance policy. On a trial by jury in Pemiscot County, April 15, 1929, a verdict was returned in favor of the plaintiffs for $36,287.50; judgment accordingly, from which the defendant appealed.

The plaintiffs, husband and wife, were engaged as partners in the lumber and timber business with head office at Paducah, Kentucky. They had a number of lumber yards at various places, one called No. 6 at Bragg City, Pemiscot County, Missouri. On October 26, 1920, they procured a policy of fire insurance, No. 21735, for $25,000, running one year on the lumber and timber in that yard. The premium on that policy was $342. During the months of October and November, 1920, six other policies were written by the defendant upon the plaintiffs' lumber yards at various places. The property covered by the policy sued on was destroyed by fire June 8, 1921. The evidence satisfactorily showed that the property was worth more than $100,000. No question is raised as to the issuance of the policy, the value of the property, the destruction by fire, and the proofs of loss.

The answer pleads several defenses. Those upon which the defendant relies are: First, a general denial; second, a failure of consideration, in that no part of the premium was ever paid; third, a cancellation of the policy in March, 1921; fourth, a cancellation by consent in that the plaintiffs acquiesced after notice of the cancellation March 18, 1921, until after the fire; fifth, that one Auber Smith, who holds himself out to the public and to the defendant as an independent insurance broker, was in fact in the employ of the plaintiffs on a salary, attending to the plaintiffs' business in procuring the policy sued on, and other policies on other yards belonging to plaintiffs; that the relation between the plaintiffs and Auber Smith was unknown to the defendant, and that the concealment of that relation constituted a fraud which would vitiate any payments made by plaintiffs to Auber Smith as premiums on this and other policies. Other facts are pleaded which are more in the nature of evidence in support of the particular defenses mentioned.

The case was before this court on a former appeal (320 Mo. 146, 6 S. W. (2d) 920). On the first trial, on the application of the defendant, a referee was appointed by the trial court. Upon examination of the facts, the referee found and reported that the plaintiffs did in fact pay the premium on the policy in suit to Auber Smith, but that Auber Smith at the time was a dual agent of both plaintiffs and defendant without the latter's consent. For this reason the referee reported as a conclusion of law that such payment of the premium was not binding and recommended judgment for the defendant, which was accordingly rendered by the trial court. On appeal this court held that the appointment of a referee was unauthorized; that the case was one for submission to a jury, and therefore reversed the judgment and remanded the cause. There (320 Mo. 146, 6 S. W. (2d)

920) we decided several questions presented on this appeal. The opinion quite fully states the pertinent facts in the case, but we find it convenient to give a brief statement of such facts.

Plaintiffs do not contend that defendant actually received the premium on policy 21735, but claim it was paid by them to Auber Smith. In order to understand the nature of the transaction, which plaintiffs claim as payment, it is necessary first to determine Auber Smith's relation to the plaintiffs.

He had an office in the plaintiffs' suite, for which he paid the plaintiffs a rental of twenty-five dollars a month. He was employed by the plaintiffs as an office efficiency expert. His business was to revise the bookkeeping system which the plaintiffs used, and the manner of reporting operations from the different branches of the plaintiffs' business. He testified that he had no interest in the business of A. B. Smith Lumber Company; that he had no authority over its employees; that he did not transact any of its business; that his agreement with A. B. Smith was that he should continue uninterrupted in his insurance business and give A. B. Smith the balance of his time not devoted to the insurance business, and that he consolidated his two interests in one office with two clerks. The arrangement was concluded in April, 1919. He had been in the brokerage insurance business for twenty-one years, insuring the property of plaintiffs sixteen or seventeen years. A. B. Smith paid him for his services in reconstructing his accounting system at first $3,000 a year, which was later increased to $5,000 a year, and still later reduced. He swore that he had from 300 to 500 insured customers, including A. B. Smith Lumber Company, and that he wrote policies for all of them in much the same way he did for the A. B. Smith Lumber Company.

The defendant took the depositions of Auber Smith, A. B. Smith, his wife E. K. Smith, and introduced them in evidence. A. B. Smith testified that Auber Smith's duty was to see that the clerks and bookkeepers conformed to what he thought was the proper standard of keeping books and papers. That was the branch of business over which Auber Smith had supervision. Auber did not go out and direct the superintendency and management of the lumber plants. A. B. Smith had nothing whatever to do with Auber Smith's insurance business.

Auber Smith testified: "They [defendant] did not send me the policies to be delivered to A. B. Smith Lumber Company. The Ohio Millers' Mutual Insurance Company did business with me, and they sent these policies on my application; they didn't know whether I was going to deliver them to A. B. Smith Lumber Company or John Jones."

The defendant in all correspondence in relation to those premiums addressed its letters to Auber Smith. A statement was sent him by the defendant February 15th asking for a check, reminding

Auber Smith that their rule was to have payment on policies written in October not later than January first, and on policies written in November not later than February first, following.

February 23rd the defendant's president, W. H. Clark, addressed a letter to Auber Smith, giving the numbers of the seven policies issued by that company covering the plaintiffs' properties, including policy No. 21735, reminding Auber Smith of the letter of the fifteenth, and using this expression: "Now unless the check covering all past due premiums amounting to $1,824.20 is received by us by return mail, we shall be obliged to cancel the above mentioned policies.". It appears there was no reply to that letter.

Mr. Clark in his testimony explained that premiums on the seven policies amounted to $2,026.89, leaving $1,824.20 due from Auber Smith after deducting his ten per cent commission. March 3, 1921, Mr. Clark sent a telegram to Auber Smith asking for the main office address of A. B. Smith Lumber Company, saying "Desire to cancel policies." On receipt of the telegram Auber Smith wired to the defendant, asking it to withhold action until letter should be received. March 4, Auber Smith wrote a long letter to the defendant in which he called attention to the bad condition of the lumber business, and said he hoped soon to get a check from A. B. Smith Lumber Company. Then he mentioned a great amount of indebtedness due A. B. Smith Lumber Company and the difficulty and delay of collection. He suggested that the lumber company desired to give notes at eight per cent for the premiums; that he could not handle them and requested defendant to handle them. Another letter said to be dated March 3, addressed by Mr. Clark to Auber Smith, was introduced, of which only the concluding paragraph is in the record. It relates to other policies of defendant not among those issued to plaintiffs. The closing part of that letter asks Auber Smith to confer with the assured and wire result, saying that if a check was forthcoming, the insurance would be continued, otherwise it would be canceled. March 10th, the defendant wrote to A. B. Smith Lumber Company giving the numbers of the seven policies written for plaintiffs, including No. 21735, saying that the letter was notice that those policies were canceled, effective from noon March 16th following. With that letter was enclosed a statement for $776.93, the amount of the premiums on those policies after deducting the unearned premiums. This letter was sent by registered mail and the receipt on the poster's card was "A. B. Smith Lumber Company, per Robinson." A. B. Smith testified that he never saw the letter, but admitted that Robinson was an employee of his, and in a letter written to defendant June 22, 1921, after the fire, he protested that his record showed that he paid "your agent Auber Smith not only this premium, but also other premiums with your company, and if Smith had not

paid you, he is responsible and you certainly should have no trouble in collecting.''

In order to show that they had paid the premium, the plaintiffs introduced a check for $1150, signed by A. B. Smith Lumber Company, payable to Auber Smith, dated November 9, 1920, indorsed by Auber Smith and stamped ''paid'' by bank stamp November 10, 1920. There is no dispute that Auber Smith received that money at that time. The total of the premiums then due, less his commission as stated above, was $1,824.20. November 23, the plaintiff paid Auber Smith by check $765.50. This with the check for $1150 would more than pay the premiums on the seven policies less Auber's commission. This check is explained by a balance due from plaintiffs to Auber Smith on other policies, and a debt due by Auber Smith on account of rent. Auber Smith instead of transmitting to defendant the money, proceeds of those checks, used $1141 to pay an overdraft, caused by his previous check for that amount to the Ocean Accident & Guaranty Company, with whom it appears A. B. Smith Lumber Company had nothing to do.

Appellant showed that Auber Smith presented an account for premiums due on the seven policies to A. B. Smith Lumber Company on November 11th, two days after the date of this check for $1150, and claimed for that reason it could not have been intended to apply on the seven policies, including the one sued on, because the account had not then been rendered. A. B. Smith explained it in this way: He said that Auber Smith came to him on the 9th, two days before he got the bill, and asked for a check for $1150, said that he needed the money, and no doubt Auber did; he was usually in that condition. A. B. Smith handed him the check, and the bill was afterwards made out.

The letter of March 4th, mentioned above, was dictated by Auber Smith and his name was signed to it by Edna K. Smith, though she testified that she did not read it and did not know what was in it. She was accustomed to sign letters dictated by A. B. Smith when written in his absence, and sometimes performed that office for Auber Smith.

I. Appellant first assigns error to the action of the trial court in overruling the defendant's demurrer to the evidence. All the essential facts relied upon by appellant on this point were before the court on a former appeal, and it was held that the issues should be submitted to the jury. This court said, 320 Mo. l. c. 169, 6 S. W. (2d) l. c. 928:

''Notwithstanding Auber Smith is frequently referred to in the testimony as a 'broker' rather than as an 'agent,' we think his testimony and that of appellants and Auber Smith in connection with the other evidence was sufficient to take the issue of dual agency to the triers of fact, as well as the question whether the

payments made by appellants to Auber Smith were, or were not. intended by appellants to be applied on respondent's policies."

A. B. Smith and E. K. Smith each testified that the checks for $1150 and $765.50 were to be applied on the seven policies taken out in October and November, and they so instructed Auber Smith. If that is true, then the premium on this policy in suit was paid in November, 1920, unless Auber Smith's alleged double agency constituted such fraud as to relieve the defendant from liability, and that was a matter for the jury. Auber Smith's conduct was inconsistent and his evidence contradictory; probably he deceived both the plaintiffs and defendant. It will be noted that all through the correspondence the defendant treated Auber Smith as the person liable to it for those premiums, as an independent broker. The letter of May 7th, after the attempted cancellation, presented him a bill for the earned premiums on the policies claimed to be canceled, and used this expression: "As before stated, we hold you responsible for the payment of these earned premiums." In like manner they held him liable for the total premiums before the alleged cancellation. The fact that Auber Smith had an office in the same suite with the plaintiffs, that he had charge of a certain department of plaintiffs' business, revising plaintiffs' system of bookkeeping, was admitted. That the plaintiffs knew nothing whatever about Auber Smith's dealings with the insurance company, that he kept his correspondence with them to himself, is fairly inferable from the evidence. It would be singular if A. B. Smith with $100,000 worth of lumber on hand would deliberately allow his insurance policies to lapse for non-payment when apparently he was fully able to pay the premiums. In his letter, by which it is claimed he admitted knowledge of the cancellation and thereby contradicted his evidence, he shows a somewhat confused notion of the situation. He says: "So far as this notice having been a cancellation notice, we are not aware of that fact, but merely assumed that it was a notice that the premium had not been paid to you by Mr. Smith. This was no affair of ours, therefore it was not necessary for us to advise." This is quite awkward if not an ingenious attempt to deny that he had knowledge of the letter addressed to A. B. Smith & Company, canceling the policies, and is in direct conflict with his own testimony that he did not know what was in the letter. The jury might very well on that evidence have disbelieved anything he said and have found that the premiums were not paid.

Nevertheless, if in fact A. B. Smith had directed the two November checks, delivered to Auber Smith, to be applied on the bill for the seven policies written in October and November, as A. B. and E. K. Smith swore, and as the referee found on the first trial, the premiums were paid. The attempt of A. B. Smith to ignore the cancellation notice may have been a bluff, or an attempt

to get by without promptly paying a premium which he knew he would have to pay in the end. His contradictions and his doubtful relation to Auber Smith only affect his credibility as a witness. All those things do not nullify·the fact of payment by the two checks mentioned, if he directed their application as he swore he did.

The plaintiffs from the start opened their books and papers for the inspection of defendant's agents; apparently with no attempt to conceal anything shown by those records and files. Defendant depended upon them and the depositions of plaintiffs to make out its defense.

All points necessary to make out a case seem admitted by defendant except that it claims plaintiffs must not only prove the execution and delivery of the policy, their ownership of the property, its total loss, but also compliance with the conditions of the policy, which includes payment of the premium. Plaintiffs contend that the burden is on the defendant to prove a want of consideration. The facts tending to show payment appear in defendant's evidence.

A submissible case was made out.

II. Appellant complains of Instruction "A" which, after defining the policy as a contract of indemnity, tells the jury that if they believe the "plaintiff owned the property covered by the policy, and that the same was destroyed by fire June 8, 1921, plaintiff was entitled to recover unless you find for the defendant under other instructions given herein."

That instruction would be harmless if there were no error in Instructions 14 and 15, given for the plaintiffs, which are as follows:

"14. The court instructs the jury that one defense set up in this case is that plaintiffs did not pay the premium on the policy in question; and another defense is, that one Auber Smith acted in a dual capacity, representing both the plaintiffs and the defendant in the matter of collecting and payment of the premium on the policy in question; and another defense is that said Auber Smith and the plaintiffs fraudulently acted together in a conspiracy in the matter of the premium on the policy in question (as set out in other instructions given in this case). Now, therefore, as to these defenses, you are instructed that the burden of proof upon each of said defenses is upon the defendant, and that you should not find for defendant, upon either of said defenses upon which you find and believe defendant has failed to make out and establish by the preponderance or greater weight of all the evidence in this case.

"15. The court instructs the jury that the burden of proof is upon the defendant to establish by the greater weight or preponderance of all the evidence one or more of the various defenses

interposed herein by it, and unless you find and believe by the greater weight or preponderance of the evidence that the defendant has so made out one or more of its defenses herein, then you must find the issues for the plaintiffs.''

While the burden was upon the defendant to prove its affirmative defenses, those instructions placed the burden upon the defendant to prove that the premium was not paid, a negative defense.

The defense of non-payment is presented here in a general denial. The plaintiffs in their petition alleged that the defendant made its policy of insurance ''whereby in consideration of the payment by plaintiffs to defendant of the premium of $342, defendant insured plaintiffs against loss or damage by fire,'' etc. That is an allegation of the payment of premium as a part of plaintiffs' case. The defendant in its answer denies each and every allegation in the plaintiffs' petition. Then as a further defense it alleges that no premium was ever paid and therefore there was no consideration for the policy. Then followed the affirmative defenses mentioned above. The plea of want of consideration is merely another way of pleading in the form of a different and distinct defense a failure to pay the premium.

The general rule upon this subject is stated in 26 Corpus Juris, page 514, Section 721:

''The general rules relating to the burden of proof in other civil actions on contract apply in an action on a fire insurance policy. In accordance with such rules the burden is on plaintiff to prove, by a preponderance of the evidence, every fact in issue which is essential to his cause of action.''

And on page 492, Section 693:

''The general rule requiring plaintiff in an action on contract to allege performance on his part of conditions precedent and dependent or concurrent covenants is applied in actions on policies of fire insurance, so as to require plaintiff either to allege performance, of conditions and warranties in the policy which are made essential to its operation as a contract, or to allege a waiver of performance or a legal excuse for non-performance.''

Also on page 516, Section 725:

''Plaintiff is required to allege performance of conditions precedent to a right of recovery, and therefore logically has the burden of proving performance, or a legal excuse for non-performance.''

As to promissory warranties and conditions subsequent, it is not necessary to negative a breach of such warranties; such a breach would constitute an affirmative defense.

In Stephens v. Fire Association of Philadelphia, 139 Mo. App. l. c. 374, an action on a fire insurance policy, the Springfield Court of Appeals held that the burden was on the plaintiff to allege and prove the payment of the premium. The ruling in that case, so far as we can find, has never been criticized in the courts of this State.

All the cases cited by respondent to show what is necessary to make out a case on an insurance policy and the burden of proof are *life* insurance policies. Usually such a policy has some condition, such as that it shall not be effective before the premium is paid, or it recites that the premium is paid, or that the policy is incontestable after a certain period. But the fundamental difference between a life insurance policy and a fire insurance policy is that in the former, after the death of the insured, whether payments of premium have been made is peculiarly within the knowledge of the insurer. The insured who had such knowledge is dead. For that reason in life insurance policies in the allegation of non-payment, a negative defense, the burden is upon the party alleging the negative to prove it. The matter is illustrated in Swinhart v. St. Louis & Sub. Ry. Co., 207 Mo. l. c. 434, quoting from an earlier case, where it is stated that as a general rule, he who alleges an affirmative is bound to prove it. The exceptions are where a negative allegation is necessary to a cause of action or a defense and the subject-matter of the negative averment lies peculiarly within the knowledge of the party making the averment; then that party has the burden of proving such negative averment.

Harris v. Security Life Insurance Company of America, 248 Mo. 304, cited in the cases upon which the appellant depends, was a life insurance case, and this was said, l. c. 318:

*"Whether the premiums had been received or not was a matter peculiarly within the knowledge of the appellant.* It, however, neither pleaded nor proved non-payment; although if that were the fact, the policy would have been relieved of the preclusion of the clause making it incontestable after one year, and it would have been open to any legitimate defenses, such as false warranties or fraudulent representations. The record contains no positive proof of the payment of the second premium. The payment of the first premium is admitted.

*"Under these circumstances,* the production of the policy, together with proof and due notice of the death of the insured, made a prima-facie case for the respondent, and cast upon the defendant the burden of showing whether any premium was unpaid at the death of the insured." (Italics ours.)

State ex rel. Bankers Life Company v. Reynolds, 277 Mo. 14, was a case of certiorari to the court of appeals. An action was begun on a policy in an assessment life insurance corporation. On a trial the jury rendered a verdict for the plaintiff. The insurance company appealed to the court of appeals, where the judgment was reversed. One point made by the relator insurance company was that the demurrer to the evidence should have been sustained because the plaintiff did not prove payment of all the premiums or assessments falling due up to the date of the assured's death. The court of appeals held that the burden of showing whether any in-

stallments were unpaid at the death of the insured rested upon the defendant. This court, in refusing to quash the record of the court of appeals on that ground, quoted from the Harris case noted above, and said, at page 21: "It is patent from a reading of the cases urged by relator [insurance company] as being in conflict with what the court of appeals said on the above point, that these cases but announce the general rule to which the rule in an action upon a contract of life insurance is an exception." Which means that the court of appeals, in placing the burden of proving the non-payment of premiums upon the defendant, followed an exception to the *general rule* that the burden is on the plaintiff to prove payment, the exception applying alone to actions on life policies.

No case involving a fire insurance policy similar to the one involved here has been cited. The plaintiff tendered the issue by alleging the payment of the premium. The defendant joined issue by a general denial. The premium was not paid at the time the policy was issued; it was not intended to be paid at that time. The correspondence shows that the defendant expected payment of the premium not later than the first of the second month after the issuance of the policy. That seems to have been understood by A. B. Smith and Auber Smith. At the close of the plaintiffs' case no demurrer was offered to the evidence. Defendant presented a demurrer at the close of the case after it had introduced evidence showing the facts which the plaintiffs claim constitute the payment. However cogent plaintiffs' evidence may have been upon that point, it was a question for the jury and the burden was on the plaintiffs.

The burden was on the defendant to prove every affirmative defense, such as the cancellation of the policy; the cancellation by consent; the dual agency of Auber Smith; the alleged fraud and concealment of Smith's relation to the plaintiff; and fraud by false entries alleged. The facts relating to payment of the premium, *on plaintiffs' theory of the case,* were peculiarly within the knowledge of the plaintiffs. It is therefore like an action on any other contract; the plaintiffs must prove performance of their contract before they can recover; the burden was on them to prove such performance. The instructions should be framed to that effect. Therefore Instructions 14 and 15 were erroneous.

III. Appellant assigns error to the giving of instruction numbered ten on behalf of plaintiffs. The jury was directed that if they find that Auber Smith did collect the premiums and in doing so acted for himself alone, or acted alone as the agent of defendant, they should find there was no dual agency, and added this: "And this is true even though you may further believe that Auber Smith was in the general employment of plaintiffs." It is contended all through by the plaintiffs that Auber Smith was *not* in the general employment of the plaintiffs,

that he was employed for a special and peculiar purpose entirely apart from the general business. The instruction is inconsistent with other proper instructions on the question of dual agency. Therefore the instruction was erroneous. Also because of the closing part where it assumes that letters and communications passed between Auber Smith and the defendant, of which the plaintiffs had no knowledge.

Instruction 13 given on behalf of the plaintiffs tells the jury that, if the plaintiffs paid the premium on such policy as set out in other instructions and the defendant did not repay the plaintiffs the unearned portion thereon, then the defendant's attempted cancellation of the policy was not binding on the plaintiffs. The provision in the policy in relation to that matter contains the following:

"This policy may be cancelled at any time by the company by giving to the insured a five days' written notice of cancellation with or without tender of the excess of paid premium above the *pro rata* premium for the expired time, which excess, if not tendered, shall be refunded on demand. Notice of cancellation shall state that said excess premium (if not tendered) will be refunded on demand."

Therefore that instruction was error.

The fundamental error in the instruction is that the matter mentioned was not in issue, though both parties treated it that way and neither could complain on that account. The defendant asserted its right to cancel, because the premium was not paid, and for no other reason. If the premium *was* paid, it had no right to cancel the policy, refund or no refund. Plaintiffs on the other hand contend that the premium was paid, and do not deny the right to cancel if it was not paid. The question was whether or not the premium was paid. The refund of unearned premium is not in issue.

The appellant also complains of the refusal of a number of instructions offered by it. In the instructions actually given for the defendant, every defense was submitted to the jury in a form of which the defendant cannot complain. It is unnecessary to point out specifically the appropriateness of such instructions. If there is an error in any of them, it is favorable to the defendant, and the matter properly covered by those refused is contained in those given.

For the errors mentioned, the judgment is reversed and the cause remanded. All concur, except *Walker, J.*, absent.